

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **BOBBY G. LOGGINS** | § | Case No. 11-60283 |
| | § | |
| Debtor | § | Chapter 7 |

| | | |
|---|---|---|
| CHRISTOPHER MOSER, | § | |
| Chapter 7 Trustee | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Adversary No. 12-6012 |
| | § | |
| BANK OF TYLER, a division of | § | |
| HUNTINGTON STATE BANK | § | |
| | § | |
| Defendant | § | |

### <u>MEMORANDUM OF DECISION</u>

ON THIS DATE the Court considered the Motion for Summary Judgment filed by Plaintiff, Christopher Moser, the duly-appointed Trustee of the Chapter 7 Bankruptcy Estate of Bobby G. Loggins (the "Trustee"), and the competing Motion for Summary Judgment filed by the Defendant, Bank of Tyler, a division of Huntington State Bank (the "Bank"), the responses in opposition thereto, and the corresponding replies.  The complaint in this action alleges that the Chapter 7 bankruptcy estate is entitled to recover from the Bank the sum of approximately $2.1 million which the Trustee asserts was either a preferential transfer under 11 U.S.C. § 547 or a fraudulent transfer under 11 U.S.C. §§544 or 548.  Based upon the Court's consideration of the competing Motions, the memoranda in support and opposition thereto, the proper summary judgment evidence

tendered to the Court, and for the reasons stated in this Memorandum, the Court

concludes that the Trustee's Motion for Summary Judgment should be granted as to the

recovery of a preferential transfer[1] and that the Bank's Motion for Summary Judgment

should be denied.  This disposes of all issues currently before the Court.[2]

## Factual and Procedural Background[3]

In the fall of 2010, the Debtor, Bobby G. Loggins (the "Debtor"), and his spouse,

Linda E. Loggins, had incurred approximately $3.6 million in unsecured liabilities to the

Defendant, Bank of Tyler,[4] stemming from the execution of certain guaranty agreements

by the Debtor in June 2008 and April 2009.[5]  The Debtor signed these agreements as an

accommodation to the Bank in order to facilitate the making of a series of loans by the

---

[1]  In light of the summary judgment rendered for the benefit of the Estate under §547, the Court does not reach the fraudulent transfer issues.

[2]  This Court has jurisdiction to consider the complaint pursuant to 28 U.S.C. §1335 and §1334 and 28 U.S.C. §157(a).  The Court has the authority to enter a final judgment in this adversary proceeding since it constitutes a core proceeding as contemplated by 28 U.S.C. §157(b)(2)(E), (F), (H), and/or (O) and meets all constitutional standards for the proper exercise of full judicial power by this Court.

[3]  The facts presented are those the Court believes to be uncontested between the parties and are presented only as a general factual background to the legal claims asserted in the case.  This section is not intended to resolve any disputed or contested facts.

[4]  Both parties presented the evidence in support of their respective motions for summary judgment in the form of appendices.  Deferring to the pagination format utilized by the parties, citations to the Trustee's Appendix pertaining to his Motion for Summary Judgment herein will be denoted as "Pl. App." [see dkt #23].  Citations to the Bank's Appendix pertaining to its Motion for Summary Judgment will be denoted as the "Def. App." [see dkt #24].  Additional documents were presented by the Bank in the context of its response to the Trustee's motion.  Most of those were duplicates of previously-submitted documents.  To the extent any document is referenced from the Bank's response appendix, it will be cited as "Def. Resp. App."

[5]  Def. App. 12-14, 15-19, 20-22, 28-30.

Bank to Loggins Culinary, LLC ("Culinary") and Loggins Properties, LLC ("Properties"), respectively, each of which was owned by the Debtor's non-filing spouse, Linda Loggins.[6]  Though he acted as a guarantor of the companies' obligations to the Bank and had signatory privileges on the companies' accounts at the Bank, the Debtor had no personal bank account at the Bank.[7]

A portion of the indebtedness owed to the Bank by the Debtor arose as a result of the deposit of certain checks into the respective business checking accounts of Culinary and Properties at the Bank.  Between August 11-13, 2010, nine separate checks totaling $2,107,658.64, some of which drawn upon the Debtor's personal bank account at Citizens State Bank and others from the Southside Bank account of Loggins Meat Co., Inc., were deposited into the Culinary and Properties bank accounts at the Bank.[8]  The deposits triggered provisional credits for the two companies, which were quickly utilized.[9]  However, when presented for final settlement to the respective payor banks, all nine checks were returned for insufficient funds at the end of August 2010,[10] resulting in account overdrafts in the two company accounts totaling $2,107,658.64, the full amount

---

[6]  The Court is cognizant that, after the Debtor consented to the entry of an order for relief in his involuntary case, his spouse filed a voluntary petition for relief under Chapter 7 on June 21, 2013 under case no. 13-60489.

[7]  Pl. App. 48-49.

[8]  Def. App. 62-66.

[9]  Pl. App. 50; 179-180; Def. App. 53-54, 57-58.  *See infra* notes 87 and 88, and accompanying text for a brief description of the proper and improper use of provisional credits in the bank collection process.

[10]  Pl. App. 51, lines 9-17.

of the provisional credits utilized by the companies.[11]  Discussions immediately began between the Bank and the Debtor regarding the satisfaction of these deficiencies.  After finally determining in September 2010 that payment on the overdrafted amounts was not imminent from any source,[12] the Bank charged off and closed the two company accounts.[13]

Negotiations regarding the options by which to address this substantial deficiency continued by and among the parties.  Meanwhile, the financial pressures imposed upon the Debtor and his family's business interests continued to increase.  As an example, in late August 2010, Heritage Production Credit, PCA initiated litigation against the Debtor, his wife, and Loggins Meat Co., Inc., seeking to recover approximately $9.5 million.[14]  In early October, the Bank sought to intervene in that litigation to protect its collateral position as to certain assets of Culinary and Properties.[15]  In mid-October 2010,  the Bank formally declared a default under the loan agreements with Culinary and Properties and notified the Debtor and other non-debtor guarantors of such defaults.[16]

---

[11]  Pl. App. 104-114; Def. App. 54, 58.

[12]  Pl. App. 71 and Def. App. 70, lines 7-14.  This recognition of financial inability was eventually incorporated into the Memorandum of Understanding executed by the Debtor, the Bank and Buddy Lowery.  Pl. App. 101 and Def. App. 74.

[13]  Def. App. 70-72.

[14]  Pl. App. 189-195.

[15]  Pl. App. 196-203.

[16]  *Id*. at 37-46.

In the face of those increasing financial pressures, the parties continued to negotiate in an effort to resolve the numerous problems caused by the dishonored checks. On November 3, 2010, the Debtor and his spouse proposed to the Bank a sale and leaseback of their real property "with the proceeds applied to the BOT debt," so long as the Bank would be willing to reserve a "mutually agreeable" portion of the sales proceeds in order to fund the Lufkin plant operations of the two companies for a six-month period.[17]

Though the summary judgment record does not contain any detailed account of the negotiations, it does reflect that on December 1, 2010, a Memorandum of Understanding (the "MOU") was prepared, under which it was proposed that Elvin "Buddy" Lowery, a director and majority shareholder of the Bank,[18] would purchase from the Debtor and his spouse approximately 145 acres of rural real property in Smith County, Texas, for the appraised value of such property, less the satisfaction of any outstanding encumbrances.[19] The real estate to be conveyed consisted of two tracts: (1) a 137.212-acre tract referred to as a "horse farm" or "horse ranch"; and (2) a 7.995-acre tract adjacent to and partially surrounded by the "horse farm."[20]  To be omitted from the scope of the sale was the

---

[17] Def. Resp. App. 176.  This communication occurred through the attorneys for the respective parties.

[18] Pl. App. 3-4.

[19] Pl. App. 100-103 and Def. App. 73-76.  Though the Memorandum was not actually executed by any party, it is agreed that the subsequent sales contract essentially mirrored the provisions of the Memorandum.

[20]  The Debtor and his spouse executed a Warranty Deed with Vendor's Lien in favor of Mr. Lowery on December 31, 2010 that described the property as composed of two tracts consisting of

adjacent 1.718-acre site upon which the Debtor's actual family residence was located.[21]

All net proceeds otherwise payable to the Debtor and his spouse arising from the sale of

the property would be "earmarked" for payment to the Bank.[22]   The Debtor would receive

a "right of first refusal" applicable to any attempt by Mr. Lowery to sell the subject

properties for a three-year period.[23]   The Memorandum also referenced the Loggins'

request that the Bank provide to Culinary and Properties a working capital loan of

$425,000, over half of which would be immediately repaid upon receipt of an anticipated

governmental grant of $250,000 from the City of Lufkin.[24]   None of the above-stated

provisions of the MOU created binding legal obligations, but the parties expressly

covenanted to keep the status of their negotiations confidential and to seek completion of

---

139.458 and 8.022 acres, respectively.  Pl. App. 146.  This acreage discrepancy with the 145.207 acres eventually described in the Real Estate Sales Contract is not addressed by either party.

[21]   The Debtor eventually claimed this 1.718-acre tract as his homestead in his bankruptcy case. Def. App. 236-43.  *But see infra* note 52.

[22]   Pl. App. 100-01; Def. App. 73-74.  The referenced section provided as follows:

> 2.  Earmarking of Cash Consideration.  The Cash Consideration will be paid by Lowery to Loggins only on the condition that such Cash Consideration will be paid by Loggins to BOT in restitution of all indebtedness (herein sometimes referred to as the "Indebtedness") presently owing by Loggins or an affiliate of Loggins (in the context, the term "Loggins" shall include Linda E. Loggins, the wife of Bobby G. Loggins), to BOT, such indebtedness approximating $2.1 Million Dollars.  Loggins has agreed to such earmarking and agrees and covenants with Lowery that the Cash Consideration will in fact be paid by Loggins to BOT in making restitution of the Indebtedness.

[23]   See ¶ 3 at Pl. App. 101 and Def. App. 74.  Like the subsequent Warranty Deed of 12/31/2010, this document referenced a combined acreage of 147.480 acres.

[24]   See ¶ 6 at Pl. App. 102 and Def. App. 75.

binding agreements by December 10, 2010.[20]

In fulfillment of the intentions expressed in the Memorandum of Understanding, the parties executed a Real Estate Contract (the "Sales Contract") with an effective date of December 31, 2010.[21]  The provisions of the Sales Contract tracked the language of the MOU as to the parties to the sales transaction, the asset identification, and the purchase price.  Also consistent with the MOU was the following provision:

> **Earmarking**:  Of the Total Purchase Price [which was $2.2 million], $2,107.658.64 (sometimes referred to herein as the "Earmarked Payment"), is hereby earmarked for payment to the Bank of Tyler at Closing in accordance with the [Memorandum].  Seller and Buyer will jointly instruct the Closing Agent to (i) reflect this payment on the HUD-1 and (ii) pay the Earmarked Payment to the Bank of Tyler at Closing.[22]

In accordance with the Sales Contract, Lowery placed the sum of $2.2 million in escrow with the designated closing agent, Landmark Title, Inc.[23]  No formal escrow agreement was utilized.[24]  Upon receipt of all of the executed closing documents and with the written consent of the parties,[25]  the sales transaction was closed on January 7, 2011,

---

[20]  Pl. App. 103 and Def. App. 76.

[21]  Pl. App. 116-136; Def. App. 86-106.

[22]  Pl. App. 117; Def. App. 87.

[23]  The purchase amount was obtained by Lowery through third-party financing with First Bank & Trust East Texas and he secured the repayment of such borrowed sums by granting to First Bank & Trust a deed of trust on the acquired properties as well as 552 acres located in Tyler County, Texas. Def. App. 183-84; 219-30.

[24]  Pl. App. 130-36; Def. App. 100-07.

[25]  Pl. App. 141.

as outlined in a settlement statement prepared by Landmark Title.[26]  On that date, pursuant to the directives of the parties, Landmark tendered to the Bank the net sales proceeds in the amount of $2,103,917.62.[27]

None of the sales proceeds were paid to the Debtor or his spouse.  However, the Debtor was granted certain concessions that maintained his uninterrupted possession of the ranch property.  The right of first refusal contemplated by the MOU was granted to the Debtors by Lowery.[28]  In addition thereto, Lowery immediately leased all of the purchased property back to the Debtor and his spouse in exchange for the costs of taxes, insurance and the ongoing maintenance of the property.[29]  No monthly payment was required of the Debtor and his spouse and the lease term was for an unspecified period, subject to a 30-day termination notice.

Pursuant to the MOU, the Bank made a working capital loan in the amount of $425,000 to Properties and Culinary, which included the required prepayment provision upon the companies' receipt of the $250,000 local governmental grant.[30]  The loan was guaranteed by the Debtor and his spouse and was funded by the Bank on the closing date

---

[26]  Pl. App. 142-45; Def. App. 173-76.

[27]  The balance subtracted from the purchase price, $96,082.38, satisfied an existing mortgage on the property and paid costs associated with the closing.  Def. App. 164, lines 9-15.

[28]  Pl. App. 88; Def. App. 137.

[29]  Pl. App. 152-59; Def. App. 116-23.

[30]  Def. App. 77-84.

of the sales transaction — January 7, 2011.[31]

On March 30, 2011, less than 90 days after the sale of the real property closed, an involuntary petition for relief under Chapter 7 of the Bankruptcy Code was filed against the Debtor, Bobby Gene Loggins.[32]  The Debtor contested the entry of an order for relief for a considerable period of time and progress toward a trial of the involuntary petition became protracted due to the pendency of a criminal investigation against the Debtor and the resulting invocation of the Debtor's Fifth Amendment rights.[33]  After various delays, on the eve of the trial of the involuntary petition, the Debtor conceded to the entry of an order for relief under Chapter 7 of the Bankruptcy Code on November 8, 2011.[34]  Christopher Moser was ultimately selected as the interim Chapter 7 trustee on November 16, 2011.  The Trustee subsequently filed the complaint in this adversary proceeding and has filed the present motion for summary judgment, asserting that there are no genuine issues of material fact and that, under such uncontested facts, the chapter 7 estate is entitled to a recovery of the approximate $2.1 million paid to the Bank arising from the sale of the Debtor's real property.[35]  The Trustee characterizes the transfer as avoidable as either: (1) a preferential transfer under 11 U.S.C. § 547; or, alternatively, (2) a fraudulent

---

[31]  Def. App. 85.

[32]  Def. App. 1-5.

[33]  *See, e.g.*, dkt ## 23, 36, and 41 in case no. 11-60283.

[34]  Def. App. 6.

[35]  The Trustee seeks to avoid this payment, though he is not seeking to avoid the transfer of the real property to Mr. Lowery.

transfer under 11 U.S.C. § 548 and/or § 544 [invoking state fraudulent transfer law under Texas Business & Commerce Code § 24.006].[36]  The Bank has filed a competing motion for summary judgment and contends that, under the undisputed facts, it is entitled to a judgment that denies all relief to the Trustee as a matter of law based upon its contention that the Trustee is precluded from establishing at least one essential element of his case.[37]

## Discussion

*Summary Judgment Standards*

The parties brought the competing motions for summary judgment in this adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7056.  That rule incorporates Federal Rule of Civil Procedure 56, which provides that summary judgment shall be rendered "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).[38]

Any party seeking summary judgment always bears the initial responsibility of

---

[36]  Trustee's Motion at 10-19, 21. The Trustee also claims that the transfer constitutes "a voidable transfer of potentially exempt property under 11 U.S.C. § 522(g)."  However, the Trustee's presentation of § 522(g) as an alternative method of avoidance is defeated by a plain reading of the statute.  Section 522(g) does not entitle a trustee to avoid the transfer of arguably exempt property.  Rather, it provides the mechanism by which a debtor may exempt property returned to the estate and the requirements for doing so. *See* 11 U.S.C. § 522(g); *In re Salaymeh*, 361 B.R. 822, 828 (Bankr. S.D. Tex. 2007) [discussing the purpose and operation of  § 522(g)].  The Trustee's contention that this section defeats the Bank's arguments regarding homestead is without merit.

[37]  Though the Bank's answer sets forth a number of affirmative defenses, its motion does not seek summary judgment in its favor on those asserted defenses upon which it has the burden of proof.

[38]  Pursuant to the scheduling order issued in this adversary proceeding, motions for summary judgment are required to comply in format and content with Local District Court Rule CV-56 and such motions are decided under the procedures stated therein.

informing the court of the basis for its motion.  *Celotex Corp. v. Catrett,* 477 U.S. 317,

323 (1986).  As a movant, a party asserting that a fact cannot be genuinely disputed must

support that assertion by:

> (A) citing to particular parts of materials in the record, including
> depositions, documents, electronically stored information, affidavits or
> declarations, stipulations (including those made for purposes of the motion
> only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the ... presence of a
> genuine dispute, or that an adverse party cannot produce admissible
> evidence to support the fact.

FED. R. CIV. P. 56(c).  "An issue is '*genuine'* if it is real and substantial, as opposed to

merely formal, pretended or a sham."  *Bazan ex. rel. Bazan v. Hidalgo County*, 246 F.3d

481, 489 (5th Cir. 2001) (emphasis in original).  "A fact is material only if its resolution

would affect the outcome of the action. . . . "  *Wiley v. State Farm Fire & Cas. Co.*, 585

F.3d 206, 210 (5th Cir. 2009).

    The manner in which the necessary summary judgment showing can be made

depends upon which party will bear the burden of persuasion at trial.  The Trustee bears

the ultimate burden of proof at trial regarding his claims for affirmative relief under 11

U.S.C. §§ 544, 547, and 548.[39]  In seeking summary judgment to establish the existence

of an avoidable transfer, the Trustee "must support its motion with credible evidence–

---

[39]  *See* 11 U.S.C. § 547(g) [providing that "the trustee has the burden of proving the avoidability
of a [preferential] transfer" under 11 U.S.C. § 547(b).]; *Jenkins v. Chase Home Mortgage Corp. (In re
Maple Mortgage, Inc.)*, 81 F.3d 592, 595 (5th Cir. 1996) ["[T]he trustee has the burden of proving the
elements of a fraudulent transfer."].

using any of the materials specified in Rule 56(c)–that would entitle it to a directed verdict if not controverted at trial." *Celotex*, 477 U.S. at 331 (Brennan, J., dissenting); *Int'l Shortstop, Inc. v. Rally's, Inc*., 939 F.2d 1257, 1264–65 (5th Cir.1991).

The Trustee also seeks summary judgment upon all of the affirmative defenses raised by the Bank in its answer. In that context, summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. As claims upon which the Bank has the burden of proof, summary judgment upon the affirmative defenses would be appropriate if the Trustee, as the moving party, satisfies "Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* at 331 (Brennan, J., dissenting). Thus, the Trustee may demonstrate that he is entitled to the entry of a summary judgment on all aspects of the complaint only if there exists no genuine issue of material fact as to each element necessary to establish the existence of an avoidable transfer and if the Bank has failed to produce sufficient evidence to create a factual issue regarding its own affirmative defenses.

The Bank's motion for summary judgment addresses only the elements necessary

to establish the existence of an avoidable transfer.[40]  Since its motion only addresses issues upon which the burden of proof at trial rests upon the Trustee, the Bank's burden of production with regard to its motion for summary judgment is identical to that imposed upon the Trustee with regard to the affirmative defenses.  *Id*.

If any motion for summary judgment is supported by a *prima facie* showing that the moving party is entitled to judgment as a matter of law, the party opposing that motion may not rest upon the mere allegations or denials in its pleadings, but rather must demonstrate in specific responsive pleadings the existence of specific facts constituting a genuine issue of material fact for which a trial is necessary.  *Id*. at 248-49.  In so demonstrating, the non-movant must show more than a "mere disagreement" between the parties, *Calpetco 1981 v. Marshall Exploration, Inc*., 989 F.2d 1408, 1413 (5th Cir. 1993), or that there is merely "some metaphysical doubt as to the material facts." *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Neither are unsubstantiated, conclusory assertions in the response sufficient to raise a genuine issue of material fact.  *Jacobs v. City of Port Neches,*  7 F.Supp.2d 829, 833 (E.D. Tex.1998) (citing *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir.1998)).[41]

---

[40]  The Bank's summary judgment motion does not address its affirmative defenses.

[41]  It is not the Court's responsibility to scour the record in search of triable issues; if such an issue exists, the party bearing the burden of proof at trial must demonstrate its existence affirmatively. Thus, "[w]hen evidence exists in the summary judgment record but the non-movant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the . . . court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). ["Rule 56 does not impose upon the district

To determine whether summary judgment is appropriate, the record presented is viewed in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).  Essentially, if a non-movant fails to set forth specific facts that present a triable issue, its claims should not survive summary judgment.  *Giles v. Gen. Elec. Co.,* 245 F.3d 474, 494 (5th Cir. 2001).

*Preference Analysis*

Section 547 of the Bankruptcy Code authorizes a trustee to avoid certain preferential transfers of property made from a debtor's estate in a designated period prior to the filing of a bankruptcy case.  As the Fifth Circuit has stated:

> The purpose of the preference section is two-fold. First, by permitting the trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during his slide into bankruptcy. The protection thus afforded the debtor often enables him to work his way out of a difficult financial situation through cooperation with all of his creditors. Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally. The operation of the preference section to deter "the race of diligence" of creditors to dismember the debtor before bankruptcy furthers the second goal of the preference section — that of equality of distribution.

*Coral Petroleum, Inc. v. Banque Paribas-London*, 797 F.2d 1351, 1355 (5th Cir. 1986)

---

court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment."].

(citing H.R.Rep. No. 595, 95th Cong. 1st sess. 177-78 (1977), U.S. Code Cong. & Admin.News, 1978, pp. 5787, 6138).  A trustee must prove six elements in order to successfully establish the existence of a preferential transfer under 11 U.S.C. § 547(b). Those elements are: (1) a transfer of an interest of the debtor in property; (2) to or for the benefit of a creditor; (3) for or on account of antecedent debt; (4) made while the debtor was insolvent; (5) made on or within 90 days before the date of the filing of the bankruptcy petition; and (6) that enabled the creditor to receive more than it would otherwise have received if the transfer had not been made and the case had proceeded under Chapter 7. 11 U.S.C. § 547(b); *Union Bank v. Wolas*, 502 U.S. 151, 154-55 (1991).

The Bank, as the alleged recipient of a preferential transfer, challenged the grounds underlying the Trustee's Motion on the first element – whether there was a transfer of an interest of the Debtor in property – and upon the sixth element – whether the transfer enabled the Bank to receive more than it would have received in a Chapter 7 liquidation case.  The Bank did not challenge elements two through five and, upon review of the summary judgment evidence, there is no material factual dispute that the Bank received a transfer of sales proceeds in the amount of $2,103,917.62 on account of antecedent debt[42] within the 90-day period prior to the Debtor's bankruptcy,[43] at a time when the Debtor

---

[42]  See acknowledgments in ¶ 2, Def. App. 73; Def. App. 235.  A debt is "antecedent" for purposes of § 547(b) if it was incurred before the alleged preferential transfer.  *Baker Hughes Oilfield Op. v. Cage (In re Ramba, Inc.)*, 416 F.3d 394, 399 (5th Cir. 2005).

[43]  The transfer occurred on January 7, 2011.  The involuntary petition for relief was filed against the Debtor on March 30, 2011.

was insolvent.[44]  If the two challenged requirements are resolved in favor of the Trustee, then he has met his *prima facie* burden to establish a preferential transfer, and the analysis would then shift to the preference defenses asserted by the Bank in order to determine the avoidability of that transfer.

*An Interest of the Debtor in Property*

The Trustee must initially establish that a transfer[45] of "an interest of the debtor in property" occurred.  What constitutes "an interest of the debtor in property" is not precisely defined in the Bankruptcy Code.  However, the United States Supreme Court has declared that the phrase "interest of the debtor in property" is coextensive with the term "property of the debtor" found in §541(a)(1); thereby restricting the reach of a trustee's avoidance powers only to "that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings. *Stingley v. AlliedSignal, Inc. (In re Libby Int'l, Inc.)*, 247 B.R. 463, 466 (B.A.P. 8th Cir. 2000) (internal quotations omitted).  For guidance, then, we must turn to § 541 of the Bankruptcy Code, which delineates the scope of "property of the estate," and serves as the post-petition analog to § 547(b)'s 'property of the debtor.'" *Begier v. IRS*, 496 U.S.

---

[44] The Bankruptcy Code defines insolvency as a "financial condition such that the sum of [the] entity's debts is greater than all of [its] property, at a fair valuation ..." 11 U.S.C. § 101(32).  Under § 547, "the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." 11 U.S.C. § 547(f).

[45]  The definition of a "transfer" under the Bankruptcy Code is "expansive," *Barnhill v. Johnson*, 816 U.S. 393, 400 (1992) and encompasses "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property."  11 U.S.C. § 101(54)(D).

53, 58-59 (1990).[46]   In expounding upon this required element of a §547(b) preference,

the Fifth Circuit has noted that:

> A debtor has an interest in property if that property would have been a part
> of the debtor's bankruptcy estate had the transfer not occurred.   A trustee
> cannot avoid transfers of property unless the property would have been in
> the estate and therefore available to the debtor's general creditors.
> Essentially, a voidable preference must have depleted the estate.

*Cage v. Wyo-Ben, Inc. (In re Ramba, Inc.),* 437 F.3d 457, 459-60 (5th Cir. 2006).  "If

funds cannot be used to pay the debtor's creditors, then they generally are not deemed an

asset of the debtor's estate for preference purposes." *Jenkins v. Chase Home Mortgage*

*Corp. (In re Maple Mortgage, Inc.)*, 81 F.3d 592, 595 (5th Cir. 1996).  "[T]he test of

whether a preference has occurred is not what the creditor receives but what the

bankrupt's estate has lost because it is the diminution of the bankrupt's estate, not the

unequal payment to creditors, which is the evil sought to be remedied by the avoidance of

a preferential transfer."  *Virginia Nat'l Bank v. Woodson*, 329 F.2d 836, 840 (4th Cir.

1964), quoted with approval in *Texas Amer. Bancshares, Inc. v. Clarke*, 954 F.2d 329,

339 (5th Cir. 1992).  The logic of this analysis is straightforward:

> If the property transferred is not that of the debtor, the rationales for
> preference avoidance collapse.  Maintaining intercreditor equality is a

---

[46]   The term "property of the estate" is generically defined as "all legal or equitable interests of
the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1).  *See generally*,
*United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204-05 (1983). Such an estate is also created upon the
filing of an involuntary petition.  *Kim v. Kim (In re Kim)*, 405 B.R. 179, 185 (Bankr. N.D. Tex. 2009).
The interchangeability of the phrases "interest of the debtor in property" and "property of the debtor" also
applies in fraudulent transfer jurisprudence construing 11 U.S.C. §§ 548 and 544.

relevant concern only with regard to the debtor's property, for it is only out
of that property that the debtor's creditors normally can expect to be paid.
... In short, the legal concern with preferences is not that one creditor of the
debtor gets paid while others do not, but that the payment to that creditor is
to the corresponding prejudice of other creditors.

Charles Jordan Tabb, THE LAW OF BANKRUPTCY § 6.11 at 360 (1997).

The Bank contends that, notwithstanding its admittedly unsecured status, its

receipt of all of the net proceeds arising from the sale of the Debtor's ranch 82 days prior

to the bankruptcy filing resulted in no such prejudice to other unsecured creditors.  It

initially proposes that the summary judgment evidence precludes the Trustee from

establishing that a transfer of an interest of the Debtor in property occurred because:  (1)

the funds at issue were exempt proceeds from the sale of exempt real property which

would not have constituted property of the debtor's bankruptcy estate[47] and to which the

Debtor's creditors could have looked for payment; and (2) that the property transferred

never came into the control or possession of the debtor due to the application of the

earmarking doctrine.

*Texas Property Code §41.001(c)*

The Bank contends that no diminution of the estate occurred as a result of the sale

nor was the interest of any unsecured creditor prejudiced by its receipt of the $2.1 million

---

[47]   A recent Texas bankruptcy court decision even questions whether properly-exempted property
is actually removed from the bankruptcy estate.  See *In re Garcia*, 499 B.R. 506, 512-13 (Bankr. N.D.
Tex. 2013), *aff'd sub nom. Garcia v. Bassel*, 2014 WL 1316771 (N.D. Tex., Apr. 2, 2014).

because the funds which it received "were exempt sale proceeds from exempt homestead property" which would have never been available to the estate's creditors.[48]  Of course, the generous homestead protections provided under state constitutional and statutory law to Texas citizens are well-known, and included among such protections is a temporary, six-month exemption of proceeds derived from the sale of a homestead from the claims of creditors so that such proceeds can be reinvested in another homestead.[49]  "The purpose of the exemption on home sale proceeds is *not to protect the proceeds, in and of themselves* but rather, *solely* to allow the claimant to invest the proceeds in another homestead." *Hill v. Jones (In re Jones)*, 327 B.R. 297, 302 (Bankr. S.D. Tex. 2005) (citing *Zibman v. Tow (In re Zibman)*, 268 F.3d 298, 305 (5th Cir.2001) (emphasis in original)).  The legislative intent behind this exemption is to protect Texas residents from homelessness during periods of homestead transitions.[50]  *Id.*  The selling homestead owner is allowed to hold the homestead sale proceeds for purchase of another homestead

---

[48]  Bank's Motion for Summary Judgment at p. 3.

[49]  Section 41.001(c) of the Texas Property Code provides that:

> (c) The homestead claimant's proceeds of a sale of a homestead are not subject to seizure for a creditor's claim for six months after the date of sale.

2 TEX. PROP. CODE ANN. §41.001(c) (Vernon Supp. 2013).

[50]  In the typical application of the statute, a claimant sells his original homestead and buys another at a later date, with §41.001(c) protecting the proceeds derived from the original sale until the second purchase occurs.  The second purchase "changes the prior homestead to *former* homestead and deactivates the proceeds exemption statute such that the proceeds of the former homestead are no longer exempt."  *England v. Fed. Deposit Ins. Corp. (In re England)*, 975 F.2d 1168, 1174 (5th Cir. 1992) (emphasis in original).  Proceeds remaining from the sale of the former homestead lose their exemption upon the purchase of another.  *Davis v. Davis (In re Davis)*, 170 F.3d 475, 483 n. 10 (5th Cir. 1999).

within the designated protection period, "but not to make purchases of other assets or items or otherwise dispose of the money in a way that would prejudice the interests of his creditors in his assets." *In re Zavala*, 366 B.R. 643, 653 (Bankr. W.D. Tex. 2007) (citing *Jones*, 327 B.R. at 302)). The protections afforded by § 41.001(c) terminate when a new homestead is acquired. *Studensky v. Morgan (In re Morgan)*, 481 F. App'x 183, 187 (5th Cir. 2012); *In re Garcia*, 499 B.R. 506, 513-14 (Bankr. N.D. Tex. 2013), *aff'd sub nom. Garcia v. Bassel*, 2014 WL 1316771 (N.D. Tex., Apr. 2, 2014).

The Bank contends that the sales proceeds were always outside of the reach of the debtor's creditors, and thus cannot be subject to avoidance, because the sale proceeds would have otherwise been exempt under Texas Property Code §41.001(c) for the requisite six-month period which would have encompassed the date of the filing of the involuntary petition.[51] Thus, the Bank contends that its receipt of the transfer of the sale proceeds did not deplete the bankruptcy estate or diminish the potential recovery of creditors in bankruptcy. While the Trustee refutes that assertion on various grounds, consideration of those various disputes is unnecessary since it is clear, as a matter of law,

---

[51] An individual debtor may claim certain properties as exempt under either federal or state law, subject to certain restrictions, 11 U.S.C. §522(b)(1), and when a claim is made under available state law, §522(b)(3)(A) authorizes a debtor to claim "any property that is exempt under Federal law, other than subsection (d) of this section, or State or local law that is applicable on the date of the filing of the petition . . . ." The petition date governs the determination of exemptions in an involuntary case, *Tanzi v. Comerica Bank (In re Tanzi)*, 297 B.R. 607, 611 (B.A.P. 9th Cir. 2003); *In re Gaudreault*, 315 B.R. 1, 3 (Bankr. D. Mass. 2004), although courts often allow the debtor a greater flexibility regarding exemption activities in the gap period between the date of the involuntary petition and the date of the order for relief. *See, e.g., In re Hodes*, 235 B.R. 104, 109 (Bankr. D. Kan. 1999), *aff'd*, 402 F.3d 1005 (10th Cir. 2005) [finding that when involuntary debtors exercise their rights under § 303(f) during the gap period and commence improvements to their homestead, they are entitled to claim as exempt the improvements commenced during the gap period].

that the Debtor could not have invoked the protections offered by §41.001(c) because there was never a sale of the Debtor's homestead.

It is axiomatic that a Texas resident can have only one homestead. *Achilles v. Willis*, 81 Tex. 169, 171, 16 S.W. 746 (1891); *Kendall Builders, Inc. v. Chesson*, 149 S.W.3d 796, 807 (Tex. App. – Austin 2004, no pet.). It is further true that Texas homestead rights may be lost only through death, abandonment or alienation. *In re Perry*, 345 F.3d 303, 310 (5th Cir. 2003); *Resolution Trust Corp. v. Olivarez*, 29 F.3d 201, 206 (5th Cir. 1994). However, when the size of a homestead tract is merely reduced through alienation, while the protected family continues to reside in their home on the remaining acreage, there is no termination of any homestead interest. *See generally, Wynne v. Hudson*, 66 Tex. 1, 11, 17 S.W. 110, 114 (1886) [reduction of an area of an existing homestead has no effect on validity of homestead claim to retained tract and thus reduction did not require spouse's consent]. That is the circumstance which this case presents.

The summary judgment evidence before the Court clearly demonstrates that the Debtor and his spouse have never ceased living on the homesteaded tract nor ever ceased claiming their home and the surrounding 1.718 acres as their rural homestead.[52] Thus, the Debtor's homestead rights as to the remaining acreage have never been terminated nor

---

[52] Without reaching the evidentiary objections of the Trustee pertaining thereto, the Court simply notes that the Debtor's homestead exemption forms for the four years prior to the bankruptcy, which were submitted in support of the Bank's motion for summary judgment, lists *only* the 1.718-acre tract, and not the surrounding acreage that was eventually sold to Lowery. Def. App. 245-248.

abandoned.[53]  There is no summary judgment evidence that suggests otherwise.[54]  Yet the Bank seeks to postulate a sort of Schrödinger's Homestead: one that simultaneously exists and yet was alienated to Lowery to produce exempt sales proceeds.  Texas law simply does not support such a proposition.

Though the size of the Debtor's homestead may have been reduced by the sale to Lowery, in the absence of a complete alienation of the entire homestead, the Debtor's homestead remained intact.  There has been no interruption of the Debtor's use and enjoyment of his homestead property.  Under Texas law, a person with an existing homestead cannot simultaneously seek to exempt proceeds under §41.001(c).  *See England v. Fed. Deposit Ins. Corp. (In re England)*, 975 F.2d 1168, 1174 (5th Cir. 1992).[55]  Thus, the Bank's contention that the application of  §41.001(c) somehow precludes the possibility that the sale proceeds paid by Lowery could be recovered by the bankruptcy estate for benefit of the Debtor's creditors is without merit and accordingly does not defeat the estate's interest in the recovery of those proceeds.

---

[53]  Indeed such rights were clearly claimed by the Debtor under Schedule C in his bankruptcy case.  See *Schedule C* filed on December 5, 2011 (dkt #77) in bankruptcy case no. 11-60283.

[54]  Indeed, the Bank actually concedes this point *and* attempts to use it to its advantage: "Based on the uncontroverted summary judgment evidence, there is no genuine dispute that the property was the Debtor's rural family homestead and never lost that character." Defendant's *Reply and Supporting Brief to Trustee's Response to Defendant's Motion for Summary Judgment* at 6.  "The Debtor never moved and did not abandon his existing homestead." *Id*. at 6 n. 4.

[55]  This interpretation is supported by a plain reading of the statute, which protects "proceeds of a sale of *a homestead*." 4 TEX. PROP. CODE ANN. § 41.001(c) (West Supp. 2013) (emphasis added).  For a claimant to receive proceeds protection under §41.001(c), he cannot have an existing homestead.  *See, e.g.*, *England*, 975 F.3d at 1175 (emphasis added) ["Had Mr. England not claimed his ranch as homestead, the proceeds from the Cedar Hill property would be exempt under section 41.001(c) of the Texas Property Code. *However, both cannot be exempt at the same time*."].

*Earmarking Doctrine*

As an alternative to its erroneous argument that the sales proceeds arising from the sale of the Debtor's property were protected from creditor claims through the state exemption scheme, the Bank proffers that, because the terms of the sales contract executed by the Debtor included a self-characterized "earmarking" provision directing the closing agent to pay the sales proceeds to the Bank, the Debtor possessed such an insufficient degree of control over the disposition of the sales proceeds upon sale that it should be concluded that the Debtor had no actual interest in the transferred property. Thus, according to the Bank, the "earmarked" payment which it received cannot be properly characterized as preferential.[56]

As previously discussed, it is widely recognized that "[t]here can be no preference when a debtor transfers property in which the debtor has no equitable interest." *Ramba*, 437 F.3d at 460.  Simply stated, if the property transferred did not belong to the debtor, or if the debtor was somehow precluded from exercising any control over the transfer of the property, then that debtor's creditors could be not rightfully said to have been injured by the transfer.[57]  One of the means by which that lack of control may be established is through a concept known as the "earmarking doctrine."

---

[56]  Though there is a split of authority across the country on the topic, the Fifth Circuit has clearly opined that the earmarking doctrine is not an affirmative defense, but rather it is a challenge to a trustee's ability to prove the existence of a preferential transfer under §547(b).  *Maple Mortgage, Inc.*, 81 F.3d at 596.

[57]  As a result, "a debtor has no interest in property that it holds in trust for another, or in which it has no legal or equitable interest, . . . or [in] payments that are made by a third party to reduce a debt." *Libby Int'l*, 247 B.R. at 466 (citations omitted).

"Under the earmarking doctrine, funds provided to a debtor for the purpose of paying a specific indebtedness may not be recoverable as a preference from the creditor to which they are paid, because the property 'transferred' in such a situation was never property of the debtor and so the transfer did not disadvantage other creditors."  5 COLLIER ON BANKRUPTCY ¶ 547.03[2][a] at p.547-21 (16th ed. 2013).  "The earmarking doctrine is a judicially-created, equitable exception to § 547(b) that holds that money loaned to a debtor by a new creditor to pay an existing debt to an old creditor is not a 'transfer of an interest of the debtor in property.'"  *Caillouet v. First Bank and Trust (In re Entringer Bakeries, Inc.)*, 548 F.3d 344, 347 n.3 (5th Cir. 2008).  The doctrine originally arose under the Bankruptcy Act in co-debtor cases in which a guarantor or a surety provided a debtor with funds to pay an old obligation upon which the guarantor or surety was jointly liable.  *See Luker v. Lewis Auto Glass, Inc. (In re Francis)*, 252 B.R. 143, 145-46 (Bankr. E.D. Ark. 2000) and sources cited therein.  It was subsequently extended "to situations where the new creditor is not a guarantor but merely loans funds to the debtor for the purpose of enabling the debtor to pay the old creditor.  The same rationales have been used to justify the results where the doctrine has been so extended, i.e., that the debtor held the new money 'in trust,' that the debtor did not have 'control' of the new money and that the transaction did not diminish the debtor's estate."  *McCuskey v. National Bank of Waterloo (In re Bohlen Enterp., Ltd.)*, 859 F.2d 561, 566 (8th Cir.

1988).[58]  "If all that occurs in a 'transfer' is the substitution of one creditor for another, no

preference is created because the debtor has not transferred property of his estate; he still

owes the same sum to a creditor, only the identity of the creditor has changed." *Coral*

*Petroleum,* 797 F.2d at 1356.  It has also been extended in some circuits to asset sales

transactions whose peculiar circumstances mirror the co-debtor and new creditor

rationales for providing protection from preferential avoidance actions.  *See, e.g.*, *Ramba,*

437 F.3d at 460-61.  Given that the exception is a judicially-stated exception to the

statutory text of the Bankruptcy Code and is derived from the application of equitable

principles, its application should be narrowly construed.  *Campbell v. Hanover Ins. Co.*

*(In re ESA Envtl. Specialists, Inc.)*, 709 F.3d 388, 394 n. 5 (4th Cir. 2013); *Milwaukee*

*Cheese Wisconsin, Inc. v. Bukowski (Matter of Milwaukee Cheese Wisconsin, Inc.)*, 164

B.R. 297, 303 (Bankr. E.D. Wis. 1993); *Glinka v. Bank of Vermont (In re Kelton Motors,*

*Inc.)*, 153 B.R. 417, 428 (Bankr. D. Vt. 1993).

   Notwithstanding the efforts of the Debtor and the Bank (through its insider,

Lowery) to create an artifice by which the Debtor could satisfy the unsecured "check-

kiting" debt to the Bank without exposing the transmitted payment to avoidance in the

event of a bankruptcy, those considerable efforts to create the illusion of an earmarked

---

[58]  Some courts have questioned the propriety of such extensions of this "equitable doctrine" beyond the realm of co-debtors since "the only person aided by the doctrine is the old creditor, who had nothing to do with earmarking the funds, and who, in equity, deserves no such benefit."  *Bohlen*, 859 F.2d at 566; accord, *Manchester v. First Bank & Trust Co. (In re Moses)*, 256 B.R. 641, 647 (B.A.P. 10th Cir. 2000); *Gray v. Travelers Ins. Co. (In re Neponset River Paper Co.)*, 231 B.R. 829, 835 (B.A.P. 1st Cir. 1999).

payment to the Bank must fail.  Unlike *Coral Petroleum*,[59] there is no "substitutionary

principle" invoked under these circumstances.  Unlike *Ramba*,[60] the asset which was sold

by the Debtor in this case to create the designated proceeds was completely

unencumbered and therefore available for the satisfaction of creditor claims.  Actually,

the present case is closer in substance to *Palmer v. Radio Corp. of America (In re*

*Maxwell Electronics Corp.)*, 453 F.2d 1133 (5th Cir. 1971), in which a debtor contracted

with the purchaser of its assets to assume and satisfy specified unsecured obligations of

the debtor to RCA and for which RCA actually received payments from the purchaser

during the preference period.  In construing the preference section of the Bankruptcy Act,

a statute which the Circuit has subsequently described as "substantially identical" to

§547(b),[61] the Fifth Circuit found that the debtor's consensual sale of the assets in

---

[59]  The Fifth Circuit in *Coral Petroleum* concluded that:

. . . while the *form* of the transfer might have indicated a payment from Leeward [the owner of the funds pledged to Paribas-Suisse] into Coral's general account at Paribas-Suisse, there was no issue of material fact that the *substance* of this transfer was anything other than a payment by Leeward [the owners of the pledged funds] to Paribas-Suisse and/or Paribas-London, and that what essentially occurred was a substitution of Leeward as a creditor for the creditor status of Paribas-Suisse.

*Coral Petroleum,* 797 F.2d at 1356 (emphasis in original).

[60]  In *Ramba*, the Fifth Circuit emphasized that:

*At the time of the drilling division sale*, it is undisputed that Ramba's assets were fully encumbered by Citibank's liens.  Ramba had no equity in the proceeds of the sale, and, therefore, the funds never would have been available to general creditors in the bankruptcy. . . .  Had [Purchaser] been willing to pay a higher price for the assets rather than assuming the debt, the increase in funds would have gone to Citibank, not the estate.

*Ramba*, 437 F.3d at 460-61 (emphasis added).

[61]  See *Conard Corp.*, 806 F.2d at 612.

-26-

exchange for the debt assumption provisions resulted in RCA's receipt of payment in excess of that which it would have received in the subsequent bankruptcy case and thus rendered the payments received by RCA as preferential.  *Id.* at 1136.  The decision in *Palmer* led to an identical result under similar facts in a §547 case in *Sommers v. Burton (In re Conard Corp.)*, 806 F.2d 610 (5th Cir. 1986).

The Bank, however, insists that the Debtor's lack of control over how the closing agent disseminated the sale proceeds entitles it to the same protections from avoidance that the preference defendants were afforded in *Coral Petroleum* and *Ramba*.  Yet it must artificially bifurcate the transaction in order to make that comparison. The Court must instead look at the entire transaction in order to distill its substance.  *Coral Petroleum,* 797 F.2d at 1359; *Bohlen,* 859 F.2d at 566; *Cooper v. Centar Inv. (Asia), Ltd. (In re TriGem Am. Corp.)*, 431 B.R. 855 (Bankr. C.D. Cal. 2010) ["In correctly evaluating earmarking cases, . . . it is necessary to look at the transactions as a whole."].

An examination of the entire transaction reveals that the circumstances arising in this case are quite dissimilar from those which led to the equitable application of the earmarking doctrine in *Coral Petroleum* and *Ramba.*  Unlike the inability of the debtor in *Coral Petroleum* to usurp the designated purpose of the funds which had been pledged to the payee-bank or his lack of power to disrupt the dissemination of those dedicated funds,[62] the Debtor in this case clearly had an equitable interest in the property that he

---

[62]  The Fifth Circuit in *Coral Petroleum* affirmed the district court's finding "that *at no time* did Coral have general control over the funds whereby it could independently designate to whom the money would go."  *Coral Petroleum*, 797 F.2d at 1356 (emphasis in original).

elected to sell and he exercised that power of alienation in an effort to favor his designated unsecured creditor. *Rocor International, Inc. v. Alta AH & L (In re Rocor Intern., Inc.)*, 352 B.R. 319 (Bankr. W.D. Okla. 2006) 328 ["Control, for preference purposes, means the legal right to use the funds."]. *Phillips v. Washington Legal Found.,* 524 U.S. 156, 167-68 (1998) (citing *United States v. General Motors Corp.,* 323 U.S. 373, 377–378 (1945)) ["Property denote[s] the group of rights inhering in the citizen's relation to the physical thing, as the right to ... dispose of it."]; *In re McGuire*, 2014 WL 184768, at *3 (Bankr. D. Mass., Jan. 15, 2014) [finding that a debtor held an equitable interest in property even when that right to use, occupy, and enjoy a particular residence is non-transferrable and subject to outside termination].

Conversely, this Defendant-Bank, unlike the Paribas-Suisse Bank in *Coral Petroleum*,[63] had absolutely no lien rights or any other recognized legal claim against the Debtor's non-exempt property from which the Debtor funded the improper payment and the Bank's chances of gaining such a standing, presumably by winning a race to the courthouse to obtain a judgment lien prior to bankruptcy, was speculative at best, given the Debtor's crumbling financial picture. Unlike the unsecured creditors in *Ramba* that had no reasonable expectation of payment from the sale of the encumbered assets due to the size of the debt owed to the secured creditor,[64] the asset selected to be sold by the

---

[63] "The evidence also established that at all relevant times Paribas-Suisse maintained full control over the $35,000,000 collateral and excluded any control whatever of these funds by Coral." *Id*. at 1359.

[64] Indeed, the Circuit specifically distinguished *Ramba* from its decision in *Conard* on the basis that the restaurants sold in *Conard* "were unencumbered at the time of the sale, giving the debtor an

Debtor in this case was completely unencumbered. This summary judgment record fails to reveal any barriers that would have precluded the Debtor's unsecured creditors from realizing the proceeds from any sale of the unencumbered property.

The supposition that the Debtor in this case possessed an insufficient degree of control over the disposition of the sales proceeds is risible. The summary judgment record clearly reveals that the Debtor not only had the ability, but the motivation, to take whatever action was necessary, including the relinquishment of rights to which he was otherwise entitled, in order to produce, and to divert, the sale proceeds for the benefit of the Bank in an effort to minimize the potential consequences of his check-kiting episode. Mr. Lowery, as the designated corporate representative of the Bank, acknowledged that, as expressed in the correspondence of the Debtor's attorney,[65] it was the Debtor who conceived the plan to sell his surrounding acreage.[66] It was the Debtor who sought to tender the net sales proceeds to the Bank to satisfy the dishonored checks[67] and hopefully thereby to be restored to the good graces of the Bank.[68] It was the Debtor who elected to pay the $2.1 million to the Bank.[69] Lowery candidly acknowledged that his purchase

---

equitable interest in the asset. Here, Ramba only held legal title at the time of the Patterson transaction." *Ramba*, 437 F.3d at 461.

[65] *See supra* note 17.

[66] Pl. App. 30, lines 13-14.

[67] Pl. App. 16, lines 16-20.

[68] Pl. App. 20, lines 19-23.

[69] Pl. App. 15, lines 24-25.

money was paid to the Debtor.[70]  It was not Mr. Lowery who insisted upon the earmark.[71]

As Mr. Lowery unequivocally and candidly acknowledged, the plan was simple — "I

paid him.  He paid the bank.  That's simple and clear."[72]

    The power to control this transaction was held by the Debtor.[73]  The Debtor had

the right to receive the sales proceeds.[74]  He had the power and discretion to reject the

contract that sought to usurp his receipt of the sales proceeds.  Yet he was trying to

extricate himself from a significant legal predicament directly related to the Bank.  So he

unilaterally exercised his independent discretion to sign a real estate contract that

voluntarily forfeited his right to receive the sale proceeds.  He exercised control over the

disposition of funds through a voluntary abandonment of his right to receive the sale

proceeds from the sale of his non-exempt property.  As the closing agent admitted, the

---

[70]  Pl. App. 11, lines 16-19.

[71]  Pl. App. 20, lines 10-12.  Indeed, Mr. Lowery candidly acknowledged that it was the Bank's attorney who conceived the earmarking device, presumably as a maneuver to control the ramifications of a possible bankruptcy.  Pl. App. 19, line 8 to p. 20, line 4, where Mr. Lowery conceded that "my lawyer fixed all this up."

[72]  Pl. App. 29, lines 3-4.  The Court must express its admiration for Mr. Lowery whose honesty permeated his deposition testimony.  His testimony reflects the actual truth undergirding this transaction — that all of the parties were simply trying to extract themselves from a very difficult situation until their intentions were overwhelmed by subsequent legal events.  The Bank's personnel and professionals were understandably distressed over the missing funds and, together with the considerable consequences that were seriously motivating the Debtor to "make it right," the Bank was legitimately seeking a way to recover its losses before all of the financial walls surrounding the Loggins' business enterprises collapsed while seeking to avoid any potential bankruptcy ramification.  Time was simply not on its side.

[73]  Pl. App. 33, lines 1-7.

[74]  The Bank's other representative, Don Neill, also acknowledged that the Debtor exercised dominion and control over the sales proceeds and that "he had the right to direct those funds, yes."  Pl. App. 69, lines 1-2.

Debtor authorized the transmittal of the funds to the Bank[75] and the funds would not otherwise have been sent to the Bank without the Debtor's consent and direction.[76]  The use of the title company was a mere conduit.  The use of the escrow procedure changes nothing.  *Buckley v. Jeld-Wen, Inc. (In re Interior Wood Prods. Co.)*, 986 F.2d 228, 231 (8th Cir. 1993); *In re Adams*, 102 B.R. 271, 274-75 (Bankr. M.D. Ga. 1989).  As recognized in *Feltman v. Bd. of County Comm'rs (In re S.E.L. Maduro (Florida), Inc.)*, 205 B.R. 987 (Bankr. S.D. Fla. 1997):

> Carving out exceptions by requiring a factual inquiry into who designated the creditors and what effect designations may have had on the purchase price would be inconsistent with preference policy and create an intolerably high risk of collusion.  Any time an insolvent company wanted to pay preferred creditors from the proceeds of a sale of assets, it could "cleanse" the funds by having the proceeds paid to an escrow agent who is instructed to disburse to the preferred creditors.

*Id*. at 992-93.  The Debtor voluntarily selected the recipient of the funds to the detriment of all of his other unsecured creditors.  That is equivalent to the type of debtor control recognized in *Entringer* and *Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111, 1117 (5th Cir. 1995).

To allow this scheme — a contrivance specifically designed to protect a preferential payment from attack — to succeed would be an erroneous misapplication of *Coral Petroleum* and a gross misapplication of the equitable doctrine of earmarking.  Its

---

[75]  Pl. App. 95, lines 22-25.

[76]  Pl. App. 96, lines 1-5.

application under these circumstances would permit a debtor to usurp the rights of

creditors by diverting millions of dollars to one selected unsecured creditor of his choice

that, due to the Debtor's own illicit conduct, was in a position to exert tremendous

pressure upon him.  It would essentially authorize a debtor to issue a disclaimer of

ownership in non-exempt assets on the eve of bankruptcy for whatever purpose he

desired.  It would improperly absolve debtor conduct that the Bankruptcy Code

specifically forbids.

Further, to endorse this scheme would open the gate for all sophisticated unsecured

creditors with an unusual degree of leverage to evade the equal distribution principle

through the clever structuring of a financial transaction.  As recognized by the Supreme

Court over a century ago,

> If the bankrupt has made a transfer of his property, the effect of which is to
> enable one of his creditors to obtain a greater percentage of his debt than
> another creditor of the same class, circuity of arrangement will not avail to
> save it. . . . It is not the mere form or method of the transaction that the act
> condemns, but the appropriation by an insolvent debtor of a portion of his
> property to the payment of a creditor's claim, so that thereby the estate is
> depleted and the creditor obtains an advantage over other creditors. . . .

*National Bank of Newport v. National Herkimer County Bank,* 225 U.S. 178, 184 (1912).

This "earmarking" machination was initiated, documented, and consummated by a

general unsecured creditor who used the debtor's malfeasant behavior as leverage to

procure a financial windfall to the detriment of other similarly-situated creditors.  While a

creditor's desire to be paid is completely defensible, this behavior is exactly what the

preference statute was designed to prevent.  The Bank contends that there would have been no sale at all if the contract had not provided for the diversion of the sale proceeds to it.  It certainly might be true that Lowery, as an insider motivated to assist the Bank, would have not elected to purchase the realty without the preferential diversion of the proceeds to the Bank.  However, Lowery has received the conveyance of the property at a fair market price.[77]  The fact that he will not receive the complete benefit of his bargain under the contract does not insulate a preferential payment from avoidance.  As in all preference cases, his contractual expectations must yield to the principle of equal distribution.  *See, e.g., Palmer*, 453 F.2d at 1140-41.  As Judge Jones recognized in *Conard*,

> The very purpose of the preference law, as noted in *Palmer*, is to restore equity among creditors of the debtor's estate by limiting the debtor's ability to prefer the interests of some creditors over others as he slides into bankruptcy.  While it always seems "unfair" that creditors such as [the Defendants] must lose the benefit of a transaction they accomplished with the debtor just prior to bankruptcy, on a more general level, it is fairer to distribute the maximum amount of assets among all creditors in accordance with the distribution principles established in the Bankruptcy Code.

*Conard*, 806 F.2d at 612.

Nothing in this instance would promote the principles of equity that has undergirded the continued judicial recognition and use of the earmarking doctrine.

---

[77]  Although, again, the Debtor received certain concessions (right of first refusal and lease-back) that maintained his family's uninterrupted possession of the ranch property.  *See supra* notes 28 and 29.

*Official Bondholders' Comm. v. Eastern Utilities Assocs. (In re EUA Power Corp.)*, 147 B.R. 634, 643 (Bankr. D.N.H. 1992) [finding that with regard to the application of the earmarking doctrine, "[I]t is incumbent upon the Court to refrain from extending the judicial doctrine involved beyond the needs that gave it birth."].  As a result, its attempted application by the Bank in this instance is illegitimate and cannot be endorsed. Accordingly, the summary judgment evidence establishes without genuine dispute that the $2.1 million in sales proceeds received by the Bank was generated by a transfer of an interest of the debtor in property.

*Preferential Effect of the Transfer*

        For the Trustee to establish existence of a preferential transfer in this case, he must also establish the sixth element – that the Bank received more as a result of the alleged preferential transfer than it would have received in a Chapter 7 liquidation.  This requires the Trustee to present a hypothetical Chapter 7 distribution analysis as of the date the bankruptcy petition was filed.  *Palmer Clay Products Co. v. Brown*, 297 U.S. 227, 229 (1936); *Matter of Superior Toy & Mfg. Co., Inc.*, 78 F.3d 1169, 1171 (7th Cir.1996); *Neuger v. United States (In re Tenna Corp.)*, 801 F.2d 819, 822 (6th Cir.1986).  As one court has described this process:

> The Supreme Court has held that whether a particular transfer is preferential
> should be determined not by what the situation would have been if the
> debtor's assets had been liquidated and distributed among his creditors at
> the time the alleged preferential payment was made, but by the actual effect
> of the payment as determined when bankruptcy results. The resulting

analysis therefore requires that in determining the amount that the transfer
enables [the] creditor to receive, such creditor must be charged with the
value of what was transferred plus any additional amount that he would be
entitled to receive from a Chapter 7 liquidation. *The net result is that, as
long as the distribution in bankruptcy is less than one-hundred percent, any
payment on account to an unsecured creditor during the preference period
will enable that creditor to receive more than he would have received in
liquidation had the payment not been made.*[78]  Thus, the relevant inquiry for
this Court is whether [creditor] would have received a 100 percent payout in
a Chapter 7 liquidation. If so, no preference can be recovered; if not, the
requirements of Section 547(b)(5) are met.  In performing this analysis,
bankruptcy courts generally take judicial notice of the documents in a case,
and it is also appropriate to take judicial notice of the Debtors' bankruptcy
case as a whole.

*Burch v. Masiz (In re Vaso Active Pharmaceuticals, Inc.)*, 500 B.R. 384, 394 (Bankr. D.

Del. 2013) (emphasis added; citations and internal quotations omitted).

The Trustee presented affidavit testimony in support of this element.[79]  He reported

that the estate possessed $5,446 in cash assets.  He noted that secured claims in the

amount of $165,999.96 and unsecured claims in the amount of $11,443,080.92 had been

filed.[80]  "Because there are currently less than $100,000 to pay to secured or unsecured

creditors," the Trustee opined that the Bank "[b]y the payment of $2,103,917.62, ...

---

[78]  *See also,  Still v. Rossville Bank (In re Chattanooga Wholesale Antiques, Inc.)*, 930 F.2d 458,
465 (6th Cir.1991); *Elliott v. Frontier Properties (In re Lewis W. Shurtleff, Inc.)*, 778 F.2d 1416, 1421
(9th Cir. 1985); *Garner v. Knoll (In re Tusa-Expo Holdings, Inc.)*, 496 B.R. 388, 399 (Bankr. N.D. Tex.
2013) [all holding that the element is met as to a transfer to an unsecured creditor so long as creditors will
not be paid in full].

[79]  Pl. App. 209-210.

[80]  The Court takes judicial notice of the schedules and claims filed in the Debtor's underlying
bankruptcy case.

received more than it would receive as an unsecured creditor in the bankruptcy case."[81]
The Debtor's schedules support the Trustee's assertion.[82]  Yet the Bank asserts that the

Trustee cannot prevail on this final element of the §547(b) analysis without the

presentation of a detailed claims analysis that outlines the potential grounds for the

prosecution of an objection against each filed claim, the likelihood of success of that

prosecution, and a precise calculation of the number of claims that may not ultimately be

allowed against this estate.  Until that time, the Bank maintains that a 100% distribution

to creditors remains "plausible."

The Trustee established that the $2.1 million transfer to the Bank had a preferential

effect.  The Trustee's affidavit, combined with the schedules and the claims register,

evidence a considerable disparity between the liabilities faced by this Estate and the

availability of non-exempt assets with which to satisfy them.  The Trustee "need not

actually reconstruct a hypothetical Chapter 7 liquidation with the precision of a forensic

accountant."  *Levine v. Custom Carpet Shop, Inc. (In re Flooring Am., Inc.)*, 302 B.R.

394, 403 (Bankr. N.D. Ga. 2003) [providing list of cases that support reliance upon

---

[81] Pl. App. 210.  Significant to this discussion is the fact that the testimony of the Debtor and his spouse regarding the scope of their assets and liabilities was unavailable to the Trustee because of their respective invocations of their Fifth Amendment rights at their depositions.

[82] The Debtor's schedules indicate non-exempt assets of approximately $250,000 and liabilities of approximately $1.5 million, but excludes any recognition of any claim by Heritage Production Credit, PCA which had initiated a pre-petition lawsuit against the Debtor, his spouse, and his meat company for $9.5 million.  See dkt # 77 in case no. 11-60283.  The Court further notes that the Debtor included a "disclaimer" in which the Debtor stated that he did "not represent that they are complete inasmuch as Debtor has chosen to assert his rights under the Fifth Amendment to the U.S. Constitution to certain questions."  Def. App. 236.

affidavits and schedules to establish in a summary judgment context that unsecured

creditors would not receive 100% of their claims, schedules, and other documentation];

*see also Giuliano v. RPG Mgmt., Inc. (In re NWL Holdings, Inc.)*, 2013 WL 2436667, at

*5 (Bankr. D. Del., June 4, 2013) [concluding that trustee's affidavit is sufficient to

establish element, particularly since "there is some room for debate as to how 'specific'

must be the 'specific facts' that Rule 56(e) requires in a particular case," *citing Lujan v.

Nat. Wildlife Fed'n*, 497 U.S. 871, 889 (1990); *Maxwell v. Amtex Sys., Inc. (In re

marchFirst, Inc.)*, 2007 WL 4105816, at *3 (Bankr. N.D. Ill., Nov. 15, 2007); *Tire Kings

of Am., Inc. v. Hoffman Tire Co. (In re Tire Kings of Am., Inc.)*, 164 B.R. 40 (Bankr. M.D.

Pa. 1993); *Pioneer Tech., Inc. v. Eastwood (In re Pioneer Tech., Inc.)*, 107 B.R. 698, 701

(B.A.P. 9th Cir. 1988).  Further, the Trustee is not required to offer the complex claim

analysis and dispositive action urged by the Bank.  *Brown v. Job (In re Polo Builders,

Inc.)*, 433 B.R. 700, 713 (Bankr. N.D. Ill. 2010) ["It was entirely proper for [Trustee] to

determine the amount of unsecured claims for purposes of section 547(b)(5) based on the

claims then allowed without considering claims objections he had yet to file or even

consider filing."]. Such a requirement would essentially mandate that the claims

adjudication process be completed in a Chapter 7 case before preference actions could be

prosecuted; otherwise, preference defendants could always present an impenetrable

defense.  That is not what §547(b)(5) requires.  The submissions by the Trustee, together

with the documents filed in the Court's record, constitute sufficient evidence that there

will not be a 100% distribution to unsecured creditors in this case.

The Bank, on the other hand, offers only speculation in this context.  It provides no summary judgment evidence, only conclusory allegations and general denials, in an attempt to create a genuine issue of material fact about whether a 100% distribution from this bankruptcy estate is possible.  However, conclusory allegations without specific supporting facts have no probative value and are insufficient to defeat summary judgment.  *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 345 (5th Cir. 2007) (citing *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1991); *Watson v. Wells Fargo Bank*, 2014 WL 1453666, at *2 (W.D. Tex., Apr. 14, 2014) ["Unsubstantiated assertions, improper inferences, and unsupported speculation are not competent summary judgment evidence"].  The summary judgment record thus establishes that the Bank, as an unsecured creditor, would not receive 100% of its claim through the processes of a Chapter 7 liquidation.  Accordingly, the requirements of § 547(b)(5) have been satisfied.

Because the other elements have been established without dispute, the Trustee is entitled, at a minimum, to summary judgment that each element of a preferential transfer has been established under §547(b) in this case.  Conversely, the Bank's motion for summary judgment, which solely challenged the existence of a preferential transfer under §547(b), must be denied.

Having determined that the Trustee has established as a matter of law that a preferential transfer occurred in this case, such a transfer is avoidable by the Trustee unless insulated from avoidance due to the viability of one of the affirmative defenses

alleged by the Bank in its answer.[83] As was outlined earlier, "[w]here the burden at trial rests on the non-movant for summary judgment, the movant must merely demonstrate an absence of evidence in the summary judgment record for the non-movant's case." *Rand Energy Co. v. Strata Directional Technology, Inc. (In re Rand Energy Co.),* 259 B.R. 274, 278 (Bankr. N.D. Tex. 2001) (*citing Mississippi River Basin Alliance v. Westphal,* 230 F.3d 170, 174 (5th Cir. 2000)).

*Security Interest Under §4.210.*

The Bank first contends that it possessed a security interest in the sales proceeds pursuant to Texas Business and Commerce Code §4.210.[84]  Under §4.210, a collecting

---

[83]  The Bank's motion did not seek summary judgment as to any of its affirmative defenses. However, the Trustee did seek summary judgment that the recovery of the transfers is not precluded because the Bank is not entitled to prevail on such defenses.

[84] This Texas adoption of U.C.C. § 4-210 states, in relevant part, that:

(a)  A collecting bank has a security interest in an item and any accompanying documents or the proceeds of either:

      (1) in case of an item deposited in an account, to the extent to which credit given for the item has been withdrawn or applied;

      (2) in case of an item for which it has given credit available for withdrawal as of right, to the extent of the credit given, whether or not the credit is drawn upon or there is a right of charge-back; or

      (3) if it makes an advance on or against the item.

. . . .

(c)  Receipt by a collecting bank of a final settlement for an item is a realization on its security interest in the item, accompanying documents, and proceeds. So long as the bank does not receive final settlement for the item or give up possession of the item or possession or control of the accompanying documents for purposes other than collection, the security interest continues to that extent and is subject to Chapter 9, but:

bank receives a perfected security interest in a check (the "item")[85] and its proceeds to the

degree that it advances a provisional credit to a depositor's account in recognition of that

check as the check collection process proceeds.[86]  The credit constitutes uncollected funds

pending the completion of the collection process and the security interest is considered to

exist in favor of the collecting bank against the depositor's check during that "float

period" until the collecting bank ultimately obtains payment through a final settlement.[87]

---

       (1) no security agreement is necessary to make the security interest
       enforceable (Section 9.203(b)(3)(A));

       (2) no filing is required to perfect the security interest; and

       (3) the security interest has priority over conflicting perfected security
       interests in the item, accompanying documents, or proceeds.

4 TEX. BUS. & COMM. CODE § 4.210 (Vernon Supp. 2013).

[85]  An "item" is defined as "an instrument or a promise or order to pay money handled by a bank for collection or payment."  4 TEX. BUS. & COMM. CODE § 4.104(a)(9) (Vernon Supp. 2013).

[86]  As the Sixth Circuit recently observed,

    The collection process can be viewed as a principal-agent or debtor-creditor relationship
    and can be conceptually divided into three steps.  In the initial transaction, the depositor
    presents the check to the bank, and the bank takes the check and agrees to act as the
    collecting agent for the depositor. . . . [T]he bank may also advance to the depositor a
    provisional credit for the face value of the check and receive a security interest in the
    check (the "item"...) and its proceeds. The second step in the process is the collection of
    the check. The depositor's bank will pass along the check, usually through one or more
    intermediary banks, until it reaches the bank of the check-writer. That bank then
    withdraws the funds from the check-writer's account and passes those funds back along
    the collection chain to the depositor's bank. The third step is the "second transaction"
    between the depositor and the depositor's bank, which is often invisible to the depositor.
    The depositor's bank receives the funds from the check, keeps these funds in satisfaction
    of its security interest, and converts the provisional credit to the final payment (or "final
    settlement") to the depositor.

The White Family Companies, Inc., et al. v. Slone (In re Dayton Title Agency, Inc.), 724 F.3d 675, 683-84 (6th Cir. 2013).

[87]  It is in this "float period" that check-kiting occurs.  "Check kiting would not be possible if a bank allowed its customers to have access to funds from deposited checks only after the bank had

In an insufficient funds scenario,[88] the value of the security interest is deemed equivalent to the face value of the provisional credit, notwithstanding the practical viewpoint that a security interest in a worthless check would appear to be worthless.  As the Sixth Circuit has stated,

> Although the check is worthless in hindsight, and so the security interest may seem worthless in hindsight, . . . the security interest is worth as much as the bank "lent out" in provisional funds.  For the period during which the bank extended a provisional credit ... the kited checks are worth every penny of their face value ... because the depositor exercised effective control over "cash" money equivalent to the face value of the checks.  The text of the U.C.C. demands this interpretation because it clearly contemplates a security interest that survives noncollection of the check.

*The White Family Companies, Inc., et al. v. Slone (In re Dayton Title Agency, Inc.)*, 724 F.3d 675, 684 (6th Cir. 2013) (*citing First Tennessee Bank v. Stevenson (In re Cannon)*, 237 F.3d 716, 721 (6th Cir. 2001)).

The Bank contends in its answer that the transfer which it received from the sale of the Debtor's property was simply the "realization of its perfected security interest in one or more items drawn on and deposited into one or more accounts held by the Debtor at the

---

received final payment for those checks.  Check kiters depend on the use of provisional credit, which is the lynchpin of any successful check-kiting scheme.  Indeed, a kite crashes to the ground when the payor bank dishonors a check drawn on uncollected funds."  *Henderson v. Community Bank (In re Stinson Petroleum Co., Inc.)*, 2011 WL 1398477, at *2 (Bankr. S.D. Miss., Apr. 12, 2011).

[88]  If a check is ultimately dishonored, a collecting bank can revoke its provisional credit and "charge back the amount of any credit given for the item to its customer's account."  4 TEX. BUS. & COMM. CODE § 4.214(a) (Vernon 2002).

Defendant's banking institution."[89]   However, the summary judgment evidence establishes that the Debtor had no personal bank account at the Bank and that the proceeds were not deposited into an account owned by the Debtor.[90]   There is no summary judgment evidence that it held an "item" against the Debtor personally or that the Bank issued a provisional credit to the Debtor individually.[91]   There is no summary judgment evidence that the sales proceeds derived from the sale of the Debtor's land constituted the type of proceeds created and addressed by §4.210.   Thus, the Bank had no security interest against any property of the Debtor arising under §4.210.   While it is clear that the Bank's failure to receive a satisfactory final settlement on deposits credited for the benefit of Culinary and Properties precipitated the preferential transfer, the Bank's receipt of the sales proceeds cannot as a matter of law constitute the realization of any security interest arising for its benefit against the Debtor under §4.210 and provides no defense to the recovery of a preferential transfer.   Accordingly, summary judgment on the Bank's affirmative defense under Tex. Bus. & Comm. Code §4.210 must be rendered for the Trustee.

*Section 547(c)(1) - Contemporaneous Exchange.*

The Bank further claims in its answer that the transfer of the sale proceeds is

---

[89]   *Answer to Trustee's Original Complaint* filed in this adversary [dkt #4] at p. 7.

[90]   It is uncontested that the accounts into which the ultimately dishonored checks were deposited were those owned by Loggins Culinary, LLC and Loggins Properties, LLC — entities that were owned by Linda Loggins, the Debtor's spouse.  Def. App. 62-66.

[91]   Pl. App. 50, line 10 to p. 51, line 8.

protected from recovery by the Trustee under 11 U.S.C. §547(c)(1)[92] because the payment

constituted a contemporaneous exchange for new value given to the Debtor as intended

by the parties.[93]  "The purpose of the exception is to encourage creditors to continue to

deal with troubled debtors, and transfers protected under § 547(c)(1) are not preferential

(sic) because other creditors are not adversely affected if the debtor's estate receives new

value." *Official Comm. of Unsecured* Creditors *of 360networks (USA) Inc. v. U.S.*

*Relocation Serv., Inc. (In re 360networks (USA) Inc.)*, 338 B.R. 194, 204 (Bankr.

S.D.N.Y. 2005) (citing *Jones Truck Lines, Inc. v. Central States, S.E. and S.W. Areas*

*Pension Funds (In re Jones Truck Lines, Inc.),* 130 F.3d 323, 326 (8th Cir.1997).  This

affirmative defense "is grounded in the principle that the transfer of new value to the

debtor will offset the payments, and the *debtor's estate* will not be depleted to the

detriment of other creditors." *Lovett v. Homrich, Inc. (In re Philip Servs. Corp.)*, 359 B.R.

---

[92]   The trustee may not avoid under this section a transfer —

    (1) to the extent that such transfer was —

        (A)  intended by the debtor and the creditor to and for whose
benefit such transfer was made to be a contemporaneous
exchange for new value given to the debtor; and

        (B)  in fact a substantially contemporaneous exchange.

11 U.S.C.A. § 547(c)(1) (West 2004).

[93]   "New value" is specifically defined by §547(a)(2) as:
    money or money's worth in goods, services, or new credit, or release by a
transferee of property previously transferred to such transferee in a
transaction that is neither void nor voidable by the debtor or the trustee
under any applicable law, including proceeds of such property, but does
not include an obligation substituted for an existing obligation[.]

11 U.S.C.A. § 547(a)(2) (West 2004).

616, 632 (Bankr. S.D. Tex. 2006) (emphasis added) (citing *Gulf Oil Corp. v. Fuel Oil Supply & Terminaling, Inc. (In re Fuel Oil Supply & Terminaling, Inc.)*, 837 F.2d 224, 228 (5th Cir.1988)).  In other words, the transfer is protected from avoidance because it has caused no net economic harm to the bankruptcy estate.  *Post-Confirmation Comm. v. Tomball Forest, Ltd. (In re Bison Bldg. Holdings, Inc.)*, 473 B.R. 168, 175 (Bankr. S.D. Tex. 2012) (citations omitted) ["The purpose of the contemporaneous exchange exception is to protect transactions that do not result in a diminution of the bankruptcy estate.  If new value is given, a contemporaneous exchange does not diminish the estate."].

To establish the contemporaneous exchange defense, the Bank is required to demonstrate "intent, contemporaneousness and new value."  *Southmark Corp. v. Schulte, Roth & Zabel (In re Southmark Corp.)*, 239 F.3d 365, at *3 (5th Cir. 2000) (unpublished). In other words, the Bank is required to demonstrate that:  (1) the transfer was for new value given to the Debtor; (2) the parties intended the new value and the reciprocal transfer by the Debtor to be a contemporaneous exchange; and (3) the exchange was in fact substantially contemporaneous.  *ESA Envtl. Specialists, Inc.*, 709 F.3d at 398.

The Bank contends that the Debtor received new value for the preferential transfer of $2.1 million based upon the granting of the $425,000 working capital loan which the Bank made to Properties and Culinary at the time of the closing of the sales transaction. It is uncontested that Properties and Culinary are both limited liability companies that are owned by Linda Loggins only.  Thus, the Trustee seeks summary judgment on this affirmative defense based upon the fact that no new value was actually tendered to the

Debtor.  The Bank does not contest the fact that the Debtor in his individual capacity did

not receive any new credit from the Bank.  However, the Bank responds by simply noting

that the Debtor and his spouse were married throughout the relevant time period involved

in this dispute.  Therefore, according to the Bank, the Debtor received new value

individually from the additional credit extended to the companies because he has a

community property interest in the LLC ownership interests held by his spouse.

Assuming the general truth of the legal proposition regarding Texas community property

law upon which the Bank relies, that assertion alone is insufficient to create a genuine

issue of material fact regarding the actual realization of new value received by the

Debtor's individual estate as a result of the loan to Properties and Culinary in January

2011.

　　　　As the party asserting the validity of the affirmative defense, it is incumbent upon

the Bank to establish the degree to which, if any, the Debtor's individual estate was

enhanced by the working capital loan.  "[F]or §547(c)(1) to apply, the value given for the

transfer must actually and in real terms enhance the worth of debtor's estate." *Weinman*

*v. Walker (In re Adam Aircraft Indus., Inc.)*, 493 B.R. 834, 848-49 (Bankr. D. Colo. 2013)

(citing *Lubman v. C.A. Guard Masonry Contractor, Inc. (In re Gem Constr. Corp.)*, 262

B.R. 638, 645-46 (Bankr. E.D. Va. 2000)).  Accordingly, to determine the applicability of

the §547(c)(1) defense, the court "must measure the value given to the creditor and the

new value given to the debtor in determining the extent to which the trustee may void a

contemporaneous exchange." *Jet Florida, Inc. v. Amer. Airlines, Inc. (In re Jet Florida*

*Systems, Inc.)* 861 F.2d 1555, 1558-59 (11th Cir. 1988).  As a result, "a creditor seeking

the protection of section 547(c)(1) must prove *with specificity* the new value given to the

debtor."  *Id.* (emphasis added); *Southmark,* 239 F.3d 365, at *3 (citing *Creditors' Comm.*

*v. Spada (In re Spada)*, 903 F.2d 971, 976-77 (3d Cir. 1990)) ["Furthermore, because the

avoidable transfer is set off only to the extent that new value is given, the creditor is

required to demonstrate the specific measure of the new value received by the debtor."].

Although the degree of specificity necessary to create a genuine issue of material

fact may be less than is necessary to prevail on the defense at trial, the Bank is under an

evidentiary burden to present sufficient evidence to support its defense.[94]  It has failed to

do so.  The Debtor did not gain the money directly, yet the Bank has failed to tender

summary judgment evidence to show the degree, *if any*, to which the ownership interests

of each of the limited liability companies were actually enhanced by the working capital

loan.  The Bank has not tendered any evidence regarding the overall financial status of the

companies.  The working capital note itself describes the outstanding indebtedness that

the companies owed to the Bank alone and the note makes an unusual reference to the

inability of those companies, as the sole borrowers, even to service those particular debts

— which had led to the forbearance of any collection activity on those obligations by

both the Bank and the SBA.[95]  No balance sheet information nor any other calculations or

---

[94]  The moving party need not produce evidence showing the absence of a genuine issue of
material fact with respect to an issue on which the nonmovant bears the burden of proof. Rather, in that
situation, the moving party need only point out that the evidentiary documents in the record contain
insufficient proof concerning an essential element of the nonmovant's claim.  *Celotex,* 477 U.S. at 325.

[95]  Def. App. 78.

analysis is presented by which it could even be determined whether the equity interests held by Linda Loggins could rightfully be ascribed any value.  The record is clear that the $2.1 million payment by the Debtor to the Bank diminished the Debtor's bankruptcy estate.  However, the Bank has failed to tender sufficient summary judgment evidence to establish a genuine issue of material fact regarding whether new value was actually given to the Debtor and whether the diminution of the Debtor's individual bankruptcy estate was lessened by the working capital loan to the LLCs.  Although construed in the light most favorable to the Bank, there must be evidence of an actual factual controversy.  Since there is no actual evidence to support the existence of new value having been given to the Debtor as a result of the working capital loan, which constitutes an essential element of this affirmative defense asserted by the Bank, summary judgment on the Bank's affirmative defense of a contemporaneous exchange under §547(c)(1) of the Bankruptcy Code must be rendered for the Trustee.

*Section 547(c)(4) - Subsequent New Value*

The Bank also contends in its answer that the transfer of the sale proceeds, or at least a portion thereof, is protected from recovery by the Trustee under 11 U.S.C. §547(c)(4)[96] because the Bank provided subsequent new value to the Debtor.  "The

---

[96]   The trustee may not avoid under this section a transfer —
>   (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor —
>
>> (A)  not secured by an otherwise unavoidable security interest; and
>>
>> (B)  on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

subsequent new value defense is, like the contemporaneous exchange for new value, a statutory defense and relies on the same definition of new value."[97]  *Sarachek,* 2013 WL 1385400, at *11.

"The theory behind the 'subsequent advance' exception to the trustee's avoiding power is that to the extent unsecured new value is given to the debtor after a preferential transfer is made, the preference is repaid to the bankruptcy estate.  *Matter of Prescott*, 805 F.2d 719, 731 (7th Cir. 1986).  Under this provision, a creditor is essentially allowed to set off amounts of post-preference advances that are both unsecured and unpaid on the petition date against amounts that the creditor would otherwise have been required to return to the estate under the preference provision.  "The exception most obviously applies to revolving credit relationships. . . . Protecting the creditor who extends 'revolving credit' to the debtor is not unfair to the other creditors of the bankrupt debtor because the preferential payments are replenished by the preferred creditor's extensions of new value to the debtor."  *Laker v. Vallette (In re Toyota of Jefferson, Inc.)*, 14 F.3d 1088, 1091 (5th Cir.1994) (internal quotations omitted).  The extension of new value "need not be directly connected to the preceding preferential transfer in order to shelter it," *Williams v. Agama Sys., Inc. (In re Micro Innovations Corp.)*, 185 F.3d 329, 333 (5th Cir. 1999), but the determination of new value is still based upon the premise that an augmentation or

---

11 U.S.C.A. §547(c)(4) (West 2004).

[97] *See supra* note 93.

material benefit to the debtor's estate has occurred that offsets the reduction in the estate caused by the preferential transfer. *Reigle v. Mahajan (In re Kumar Bavishi & Associates)*, 906 F.2d 942, 950 (3d Cir. 1990) (citing *Wolinsky v. Central Vermont Teachers Credit Union (In re Ford),* 98 B.R. 669, 682 (Bankr. D. Vt. 1989)).  Thus, "our inquiry under §547(c)(4) is whether the new value replenishes the estate." *Harrah's Tunica Corp. v. Meeks (In re Armstrong)*, 291 F.3d 517,  526 (8th Cir. 2002).   A creditor invoking this affirmative defense must establish the following: (1) the creditor must have extended new value to the debtor or on debtor's behalf after receiving the preference; (2) the new value must be unsecured; and (3) the new value must remain unpaid after its transfer.  *G.H. Leidenheimer Baking Co. v. Sharp (In re SGSM Acquisition Co., LLC)*, 439 F.3d 233, 242 (5th Cir. 2006);  *Prescott*, 805 F.2d at 731.

The Bank offers the same evidence for the validity of this new value defense as it presented in support of its contemporaneous exchange defense, all based upon the Debtor's purported community property interest in the equity interests held by his spouse in the companies to which a working capital loan was made by the Bank at the time of the sales transaction. For the same failures of the Bank to present sufficient summary judgment evidence to create a genuine issue of material fact regarding the extension of new value to the Debtor, as set forth in the preceding discussion on the contemporaneous exchange defense, the Trustee is entitled to summary judgment on the Bank's subsequent new value defense based upon §547(c)(4) of the Bankruptcy Code.

*Section 550(b)*

Finally, the Bank contends, at least in its answer, that to the degree it is found to have received a preferential transfer, it is entitled to a defense against the recovery of that transfer pursuant to §550(b).[98]   The Trustee seeks summary judgment on this defense based upon its assertion that there is no genuine dispute that the Bank was an initial transferee with regard to the transfer of $2.1 million in sales proceeds which the Debtor tendered to the Bank arising from the sale of his real property.   The summary judgment record clearly supports that conclusion by demonstrating without contradiction that the Bank, pursuant to its consummated negotiations with the Debtor, exercised dominion and control over the Debtor's payment by applying it to the satisfaction of the antecedent debt arising from the dishonored checks.   *Security First Nat'l Bank v. Brunson (In re Coutee)*, 984 F.2d 138, 141 (5th Cir.1993); *Bowers v. Atlanta Motor Speedway, Inc. (In re*

---

[98]   The relevant portion of this statute reads as follows:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided . . . , the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from  —

   (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made ;

   (2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under section (a)(2) of this section from —

   (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

   (2) any immediate or mediate transferee of such transferee.

11 U.S.C.A. §550 (West 2004).

*Southeast Hotel Properties, Ltd. )*, 99 F.3d 151, 154 (4th Cir.1996) (citing *Bonded Fin.

Serv., Inc. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir.1988)) [finding that "the

minimum requirement of status as a 'transferee' is dominion over the money or other

asset, the right to put the money to one's own purposes"].

In its response to the Trustee's Motion, the Bank does not contest that conclusion

or offer any written refutation that it stood in the status of an initial transferee.  An "initial

transferee" does not get the benefit of § 550(b)(1).  *Morton v. Kievit (In re Vallecito Gas,

LLC)*, 461 B.R. 358, 412 (Bankr. N.D. Tex. 2011) (citing *In re Criswell,* 102 F.3d 1411

(5th Cir.1997)); *Richardson v. IRS (In re Anton Noll, Inc.)*, 277 B.R. 875, 878 (B.A.P. 1st

Cir. 2002) (citations omitted) ["The trustee may always recover from the initial transferee

regardless of [that transferee's] good faith, value, or lack of knowledge of the voidability

of the transfer."].  As the initial transferee, the Bank is a proper party from whom the

Trustee may recover an avoidable transfer for the benefit of the bankruptcy estate under

§550(a).  Accordingly, the Trustee is entitled to summary judgment on the Bank's defense

based upon §550(b).

## Conclusion

Based upon due consideration of the pleadings, the proper summary judgment

evidence submitted by the parties, the relevant legal authorities, and for the reasons set

forth herein, the Court concludes that the Trustee-Plaintiff, Christopher Moser, is entitled

to summary judgment to recover a preferential transfer from the Defendant, Bank of

Tyler, a division of Huntington State Bank, in the sum of $2,103,917.62, together with pre-judgment interest on such sum at the rate of 3%,[99] and post-judgment interest on the cumulative judgment amount at the federal post-judgment rate of 0.10%.[100]  Court costs in the amount of $293.00 is also awarded to the Trustee.[101]  The request for an award of attorney's fees by the Trustee is denied.[102]  Appropriate orders regarding the pending motions for summary judgment and a judgment shall be entered in this adversary proceeding that is consistent with this opinion.

Signed on 04/21/2014

THE HONORABLE BILL PARKER
UNITED STATES BANKRUPTCY JUDGE

---

[99] "Federal law governs the allowance of prejudgment interest when a cause of action arises from a federal statute." *In re Texas Gen. Petrol. Corp.*, 52 F.3d 1330, 1339 (5th Cir. 1995).  Since no evidence was tendered to the Court by the Trustee regarding an earlier date of demand, such interest will begin to accrue on the date of the Plaintiff's complaint.  Federal law also governs the determination of the proper rate of prejudgment interest, but there is no federal statute setting such a rate.  *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 984 (5th Cir. 1991).  It is proper to look state law for guidance on the proper prejudgment interest rate.  *Anderson v. Mega Lift Sys., LLC (In re Mega Sys., LLC)*, 2007 WL 1643182, at *10-11 (Bankr. E.D. Tex., June 4, 2007).  However, Texas law does not permit the prejudgment interest rate to decrease to a rate below 5%.  In light of the general economic conditions since the date of the transfer to the date of judgment, and in the exercise of the broad discretion given to this court in the determination of awards of pre-judgment interest, *Oil, Chem. & Atomic Workers Int'l Union v. Am. Cyanamid Co.*, 546 F.2d 1144 (5th Cir. 1977), the Court believes that the imposition of a 5% rate would be excessive and will instead award pre-judgment interest at the rate of 3%.

[100] In light of the summary judgment rendered for the benefit of the Estate under §547, the Court does not reach the fraudulent transfer issues.

[101] See 28 U.S.C. §1920.

[102] In adherence to the so-called "American Rule," attorneys' fees are not taxable as costs or recoverable as damages in an adversary proceeding unless such fees are authorized by statute or through an enforceable contract between the parties.  *First United Bank & Trust v. Buescher (In re Buescher)*, 491 B.R. 419, 439 (Bankr. E.D. Tex. 2013); *Bell v. Claybrook (In re Claybrook),* 385 B.R. 842, 854 (Bankr. E.D. Tex. 2008).  No such basis has been demonstrated by the Trustee.  Further, there is no federal statute that would authorize any award of attorney's fees to the Trustee under these circumstances.

-52-